# Exhibit 3

1  Victor J. Cosentino, Esq., State Bar No. 163672
   Gloria G. Medel, Esq., State Bar No. 199462
2  **LARSON & GASTON, LLP**
   200 South Los Robles Avenue, Suite 530
3  Pasadena, California 91101
   Telephone (626) 795-6001
4  Facsimile  (626) 795-0016
   victor.cosentino@larsongaston.com
5  gloria.medel@larsongaston.com

6  Attorneys for Defendants, RAIL DELIVERY SERVICES,
   INCORPORATED, GREG P. STEFFLRE,
7  AND JUDI GIRARD STEFFLRE

8
                    UNITED STATES DISTRICT COURT
9
            CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION
10

11 | SALVADOR CANAVA, JESUS | Case No. 5:19-cv-00401-SB (KKx)
12 | DOMINGUEZ, and OMAR | Honorable Stanley Blumenfeld, Jr.
   | RODRIGUEZ, individually and on | Courtroom 6C
13 | behalf of others similarly situated,
   |                        | **EXPERT REPORT OF JOHN
14 |      Plaintiffs,       | HUSING, PH.D., DATED MAY 17,
   |                        | 2021**
15 |      v.
   |                        | Complaint filed:    March 4, 2019
16 | RAIL DELIVERY SERVICES,
   | INCORPORATED AND GREG P. | Final Pre−Trial Conference:
17 | STEFFLRE, JUDI GIRARD | August 27, 2021
   | STEFFLRE,
18 |                        | Jury Trial: September 20, 2021
   |      Defendants.
19

20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

– 1 –

1  The attached document is the Expert Report of retained expert John E.
2  Husing, Ph.D., dated May 17, 2021, served pursuant to Fed. R. Civ. Proc. Rule
3  26(a)(2)(B).

4
5
6
7  Dated: May 17, 2021            By: /S/ Victor J. Cosentino, Esq.
                                     Victor J. Cosentino, Esq.,
8                                    Gloria G. Medel, Esq.,
                                     Attorneys for Defendant,
9                                    RAIL DELIVERY SERVICES,
                                     INCORPORATED
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

– 2 –

# Economics & Politics, Inc.

P.O. Box 8730
Redlands, CA 92375
(909) 307-9444 Phone
john@johnhusing.com
www.johnhusing.com

## An Analysis of Contract Drivers' Behavior at Rail Delivery Services

John E. Husing, Ph.D.

**1.      Qualifications**

a.      I, John E. Husing, Ph.D., declare and state as follows:

b.      I am a Vice President of Economics & Politics, Inc. ("ECAP"). ECAP is the longest-running economic consulting firm specializing in the Riverside and San Bernardino counties of California (Inland Empire). A copy of my current curriculum vitae is attached to this declaration as Exhibit 1. I have been studying this marketplace since 1964. In addition, I have performed numerous studies of the logistics and truck sector since roughly 2000. I have been a minority owner of ECAP since its founding in 1999. My business address is P.O. Box 8730, Redlands CA 92375. I have M.A. and Ph.D. degrees in economics from Claremont Graduate University, with a major field in regional economics. The title of my 1971 Ph.D. dissertation was the "Economic Impact of the Closure of Norton Air Force Base on the Inland Empire." I also have a B.S. degree cum laude, from St. Mary's College of California. Before my latest full-time consulting activities, I was an Associate Professor of Economics at San Bernardino Valley College and a lecturer in economics at California State University San Bernardino.

c.      My work with regard to logistics and trucking included the first detailed look at the importance of that activity on the economy of Southern California analyzed for the Southern California Association of Governments in 2004. The Ports of Los Angeles and Long Beach retained me to analyze their Clean Truck program and later to recommend the rules that were put into place allowing contract drivers in 2007. When the Port of Los Angeles issued rules requiring employee drivers instead, my work was cited repeatedly in the 2011 case of *American Trucking Ass'ns v. City of Los Angeles*, which was appealed to the Ninth Circuit Court of Appeal and ultimately, the U.S. Supreme Court. As a result of those appeals, parts of the Port of Los

Angeles' concession agreement, including its employee mandate, were found to be preempted by the Federal Aviation Administration Authorization Act.

      d.      In addition, I conducted the first analysis of net earnings for independent trucking operations in cooperation with the California Trucking Association published in 2017. Similar work was later undertaken for specific companies needing similar information on their own operations. In 2019-2020, I prepared the analysis of the impact on trucking companies from California's AB 5 for the ongoing federal lawsuit, *California Trucking Association v. Bonta*. CTA won at the district court level and lost at the appellate court level. I understand that further appeals are in process.

      e.      I have testified on the impact of trucking issues before the Southern California Air Quality Management District, the California Assembly Transportation Committee, the California Assembly Sub-Committee on Ports, the governing boards of the Ports of Los Angeles and Long Beach, and several Southern California city councils. Also, I testified before the California Assembly Moderate Democratic Caucus and the California Assembly Republican Caucus on the economic impact of the trucking and logistics sectors on providing upward mobility to moderately educated workers. I also met with the U.S. Maritime Commission on the importance of trucking to the Southern California ports and economy.

      f.      In this matter, my time is billed at $350 per hour for research, $500 per hour for testimony in court or deposition. My compensation does not depend in any way on the nature of my findings or the outcome of this case.

**2.**      **Assignment**

      a.      I have been asked by legal counsel for Defendants Rail Delivery Services, Inc., Greg Stefflre, and Judy Stefflre in the matter *Canava v. Rail Delivery Services*, CD Cal. Case No. 5:19-cv-00401-SB (KKx), to provide an analysis of the ability to control profit and loss and the independence of decision making exhibited by contract drivers working in association with Rail Delivery Services, Inc.

  b. Rail Delivery Services, Inc. (*RDS*) contracts with independent drivers to pick up and deliver interstate cargo largely throughout the Inland Empire and Los Angeles County. This report relies on detailed information from records provided by RDS for the 171 drivers who contracted with RDS in 2020 to determine their success as entrepreneurs to control their profit and loss while providing driving services and equipment to the company. This report also relies on published third-party analysis of economic and truck industry data. I take no position on the legal issues in this matter.

### 3. Materials Relied Upon in This Report

  a. Occupational Employment Survey, 2020 CA Employment Development.
  b. Federal Motor Carrier Safety Regulations Hours of Service of Drivers, On-Duty Definitions 49 CFR 395.2.
  c. American Trucking Research Institute, An Analysis of the Operation Cost of Trucking, November 2020.
  d. Detailed weekly information on 2020 metrics for each contractor from Rail Delivery Services, Incorporated.

  I reserve the right to modify or supplement any of my opinions in this report in light of any new information, including submissions by any other experts, that becomes available to me.

### 4. Standard

As a standard for comparison, the 2020 average hourly wages of employed Heavy and Tractor-Trailer Truck Drivers (*standard occupational code 53-3032*) was used. These data are published annually by the California Employment Development Department (*EDD*). The information is available by market area including the two used here: Riverside-San Bernardino Metropolitan Area (*Inland Empire*) and Los Angeles County.[1] EDD's wage information showed that:

- The average hourly wage for all 25,300 heavy-duty truck employee drivers in the Inland Empire was **$24.81**.

---

[1] Occupational Employment Survey, 2020 CA Employment Development Department
https://www.labormarketinfo.edd.ca.gov/data/oes-employment-and-wages.html.

- In Los Angeles County, it was **$23.75** for the 38,290 employee drivers.

5. **Gross Revenue**

a. To determine the median hourly earnings of the 171 RDS drivers, the following payments to each of them were totaled to form their individual gross revenues:
- Contract point to point payment;
- Fuel Surcharge paid to drivers to partially offset rising fuel costs;
- Stay-With Power Detention paid when drivers are delayed beyond the customary pick-up or delivery time-span;
- Stop Off Power Detention paid when drivers must stop at multiple sites;
- Flip Detention paid for extra time required when a container is not on a chassis (*or on an unroadable chassis*) when the driver arrives, and a railroad must handle it before it can be loaded;
- Scale time paid for a truck scale visit;
- Miscellaneous other costs.

b. For all 171 RDS drivers, the 2020 total gross revenue was $12,435,805. They earned this by moving cargo for a total of **231,663 total hours of "on-duty" time driving and non-driving time**.[2] (*see Appendix A: On-Duty Driver definition*). Their average gross revenue per hour was thus $53.68 per hour. The median was $50.90 (*half above/below*).

c. The gross revenue per hour distribution of the 171 drivers showed the largest share earning $40.00-$49.99 per hour (*49 drivers or 29%*). The range was from under $20 an hour (*4 drivers or 2%*) to $80 an hour and above (*9 or 5%*) (*Exhibit 1*).

---

[2] Federal Motor Carrier Safety Regulations Hours of Service of Drivers, On-Duty Definitions 49 CFR 395.2.

Rail Delivery Driver Analysis                                                                                    4



**6.    Gross Cost of Operations**

a.    From the gross revenue, the gross cost of operations must be deducted for each of the 171 RDS drivers. These are the sum of the following operating expenses they might incur:[3]

- Communications Tablet;
- Pre-Pass Parking;
- Cargo Insurance;
- Physical Damage Insurance;
- Unidentified Trailer Insurance;
- Auto Liability Insurance;
- Department of Motor Vehicles Registration;
- Fuel (*ATRI Western U.S. fuel factor per mile x miles driven*[4]);
- Maintenance, Repair, and Tires (*ATRI Western U.S. M&R and Tire factors per mile x miles driven*[5]).

---

[3] Cost of truck acquisition is not included due to the wide variations in accounting and tax treatment of each driver's investment. The economic impact is highly individualized as it depends upon if the vehicle is already owned, funded by loan or lease, if whether funded it is taken to term, and the time the vehicle is held.

For drivers who came to RDS with an owned truck, net earnings in sections 7 to 9 are directly compared to EDD's employee wage data. For drivers making loan or lease payments, the tax effects of amortized capital cost or lease payments deducted as expenses will impact the comparison. Contract drivers who complete leases or loans and take title to a truck have acquired an asset not available to employee drivers.

[4] American Trucking Research Institute, An Analysis of the Operation Cost of Trucking, November 2020.

[5] American Trucking Research Institute, An Analysis of the Operation Cost of Trucking, November 2020.

b.  For all 171 RDS drivers, the total cost of operations was $5,098,543. Again, that was the expenses of **231,663 hours of on-duty time.** Their average total cost per hour was thus $22.01 per hour. The median was $21.62 (*half above/below*).

c.  The distribution of the cost of operations per hour for each of the 171 drivers showed the largest share paying out $20.00-$29.99 per hour (*72 or 42%*). The range was from under $10 an hour (*3 or 2%*) to $40 or more an hour (*3 or 2%*) (*Exhibit 2*). Importantly, this distribution is tightly distributed with 138 or 80% of the drivers in a range of average costs of operation from $10 an hour to $29.99 per hour.



**7.  Net Earnings from Driver Operations**

a.  As used in this analysis, "net earnings" for the drivers is their gross revenue from RDS (discussed in section 5) less their costs of operation (discussed in section 6). Thus, net earnings are the result of taking the drivers' total gross revenue (*$12,435,805*) and deducting their total costs of operations (*$5,098,543*). The total net earnings for all RDS Drivers was **$7,337,262**. Those were the net earnings for moving cargo for a total of **231,663** total on-duty hours. Their average net earnings per hour for all drivers was thus **$31.52**. The median was $30.90 per hour (*half above/below*).

b.  The net earnings per hour distribution of the 171 drivers showed the largest share earning $30.00-$39.99 per hour (*55 or 32%*). The range was from under $20 an hour (*21 or 12%*) to $50 or more an hour (*8 or 5%*) (*Exhibit 3*). Importantly, this distribution shows 128 of the 171 drivers (*75%*) earning more than the $24.82 average wages per hour in the Inland Empire with the other 43 (*25%*) earning that level or less.

c.  **Importantly, the data revealed that on an average hourly net earnings basis, 75% of drivers who chose to contract with RDS were making sound financial decisions to contract with the company since their earnings were significantly above EDD's published wages for hourly employed workers.**



8.  Variation in Earnings by Contract Drivers

a.  Contract drivers can decide how many weeks and how many on-duty hours they wish to work. Those decisions underlie the variations in the average net earnings per driver. Other decisions made by drivers, such as their selection of hauls, routes driven, time of day they work, and management of operating expenses, also cause variations in the average net earnings per driver.

b.  Using EDD's $24.81 average hourly rate for employee drivers in the Inland Empire as the standard, an analysis was done of those contract drivers who earned more and less

than that figure. One factor is the <u>number of on-duty-hours</u> contractors decided to work for RDS in 2020:

- Those with net earnings of $24.81 or less per hour averaged 887 on-duty hours of work in 2020.
- Those with net earnings above $24.81 averaged 1,497 on-duty hours in 2020.
- It is a rule in economics that the more time a worker spends on a task, the more they understand it and the greater the efficiency with which they conduct operations. It would be expected that this would apply to contract drivers with more experience at RDS who can make decisions like the timing when they drive, selecting the loads they haul, and planning the routes they take.
- In addition, entrepreneurs motivated by increasing their net earnings will realize that spreading fixed costs of operation over more on-duty hours of work lowers the importance of those costs in determining net earnings per hour.

c. Another factor is the <u>number of miles</u> RDS's contractors decided to drive in 2020:
- Those with net earnings equal to or below the EDD average of $24.81 per hour averaged 17,609 miles of driving.
- Those with net earnings above $24.81 averaged 43,750 miles of driving.
- By driving more often they also appeared to increase their efficiency and earnings as well as spread their costs over more miles of travel in a year.

d. As would be expected, the importance of drivers deciding to work more on-duty hours and/or drive more miles showed up in the percentage that total costs made up of the gross earnings of each driver:
- Those with net earnings equal to or below the EDD average of $24.81 per hour had total costs averaging **53.1%** of their Gross Revenue, leaving 46.9% for net earnings.
- Those with net earnings above $24.81 had total costs averaging **40.5%** of their Gross Revenue, leaving 59.5% for net earnings.

e. **Crucially, the 75% of drivers who decided to work more on-duty hours and/or drive longer distances, earned well above the EDD average wage per hour.** These were good entrepreneurial decisions as they increased the efficiency of their efforts and raised

their net earnings. Also, it allowed them to spread their fixed operating costs across more on-duty hours and more trips, significantly lowering their average costs and raising their net earnings. Specifically, the increased earnings come not just from drivers adding on-duty hours but because each hour added reduced average hourly operating costs and so increased net earnings from all of those on-duty hours.

9. **Total Earnings Comparison**

a. In 2020, the EDD data also showed that the average total wage earnings for all 25,300 heavy-duty truck employee drivers in the Inland Empire was **$51,608.** In Los Angeles County, it was **$49,391** for the 38,290 employee drivers. Their calculation was based on multiplying their average hourly rate by 2,080 hours in each case (*52 weeks x 40 hours*) to create the equivalent of full-time work.

b. To estimate the equivalent earnings of RDS contract drivers, the same 2,080-hour calculation was made for each of them. The average 2,080-hour total net earnings for the 171 drivers was $65,572 (*Exhibit 4*).

c. **Again, this shows RDS's drivers making financial decisions in their own interests by working under contract with the company.** The difference is because of their higher net earnings per hour as shown above.



Rail Delivery Driver Analysis                                                                                                        9

**10.     Distribution**

a.      Looking at the weeks worked in 2020 by RDS's 171 drivers, the largest share was the 54 drivers (*32%*) who worked 49-52 weeks. These contract drivers chose to work for the longest periods with the company and were rewarded by being its top earners with average net earnings of $73,345. Their median net earnings was $73,604. Other than a group of 28 contractors who worked less than seven weeks, the next largest group had 31 drivers (*18%*) who worked 37-48 weeks. The 28 drivers who worked less than seven weeks had average net earnings of $2,856 indicating they made good business decisions in leaving RDS so quickly.

b.      **These data indicate that the drivers choosing to work the longest with RDS are making self-interested decisions to maximize the net earnings of their operations.** Those working the least were also making good decisions to leave RDS.



c.      RDS's experience with its contract drivers shows that as independent contractors, they can choose to come to or leave the company as they see fit. In 2020, a total of 94 drivers were under contract with the firm going into the intense December period. However, while 74 worked that entire month (*79%*), 20 chose to take one to three weeks off (*21%*) for the Christmas period, again an option available to them as contractors (*Exhibit 6*).

d.      **RDS's contract drivers showed a willingness to exercise their independence by taking time off in the busy month of December.**

**11. Conclusion**

Reviewing data for the 171 RDS contract drivers, the conclusion is that the vast majority made strong self-interested decisions regarding their operations that improved their net profitability. The data supports the view that in making decisions to work with RDS, the following were true:

- Far more had greater **net earnings per hour** after deducting expenses than the average employee driver working in either the Inland Empire or Los Angeles County.
- Far more had greater **total net earnings** after deducting expenses than the average employee driver working in either the Inland Empire or Los Angles County.
- Those RDS contractors choosing to work the **most were rewarded with the highest total net earnings**, far above the average employee driver in the Inland Empire or Los Angeles County.
- Those RDS contractors working the least **earned the lowest net earnings** and made rational decisions to cease their relationships with the firm.
- As business owners, the contractors working more on-duty hours and trips with RDS resulted in their operations becoming **more efficient,** leading to higher net earnings per hour.
- As entrepreneurs, the contract drivers earning above the average hourly wages in the Inland Empire and Los Angeles County choose to work longer on-duty hours and/or drive longer distances. Another apparent reason is that it enhanced their net earnings per hour by **spreading their fixed costs over more on-duty hours and miles**, thus lowering the impact on net earnings.
- Contract drivers working with RDS expressed their independent preference for more free time instead of more earnings when 21% of those that were operating entering the busy December season opted to take off one to three weeks in that period.

_[signature]_

_____
John E. Husing, Ph.D.
Dated: May 17, 2021

## Exhibit 1

## Curriculum Vitae of John E. Husing, Ph.D.

# Economics & Politics, Inc.

P.O. Box 8730
Redlands, CA 92375
(909) 307-9444
john@johnhusing.com
www.johnhusing.com

## ABOUT THE COMPANY

Economics & Politics, Inc. is a closely held corporation. The firm's primary analyst is Dr. John Husing, a regional economist who has researched issues in California since 1964. His specialties have been port-related international trade, California's goods movement industry, and the economic development of cities and counties. To extend its capability, the firm networks with a variety of specialists who assist in functions such as sampling, data collection, GIS presentation, graphic arts, and website development.

## RESUMÉ: John E. Husing, Ph.D.

### HONORS
Selected by 2006 Los Angeles Times West Magazine as one of the 100 most powerful people in Southern California.
2009, Arrowhead Distinguished Executive Officer, California State University San Bernardino.

### EDUCATION

| | | | |
|---|---|---|---|
| B.S. *cum laude* | Saint Mary's College of California | Classics & Economics | 1962 |
| M.A., Ph.D. | Claremont Graduate University | Economics | 1965, 1971 |
| | Dissertation: Economic Impact of Defense Closures on the Inland Empire | | |

### RECENT CLIENTS HAVE INCLUDED:

| | |
|---|---|
| Port of Los Angeles | Port of Long Beach |
| California Trucking Association | March Inland Global Port |
| Watson Land Company | Hillwood (©*A Perot Company*) |
| McShane Development | Stirling International Development |
| General Growth Properties | Forest City Development |
| Burlington Northern Santa Fe Railroad | Lewis Operating Companies |
| Southern California Association of Governments | Southern California Metropolitan Water District |
| Riverside County Transportation Commission | San Bernardino Associated Governments |
| Western Riverside Council of Governments | Coachella Valley Economic Partnership |
| Inland Valley Development Agency | Southern California Logistics Airport |
| Inland Empire Economic Partnership | Orange County Transportation Agency |
| San Bernardino County | Riverside County |
| Southern California Edison | Verizon |
| Citizens Business Bank | City National Bank |
| GE Capital | California Speedway |
| Arrowhead Credit Union | Entrepreneurial Capital Group |
| San Bernardino Valley Municipal Water District | State of California |
| PFF Bank | Over 40 Cities |

### POSITIONS HELD

| | | | |
|---|---|---|---|
| Vice President | Economics & Politics, Inc. & ECAP | Economics & Finance | 1965-Present |
| Editor/Writer | Inland Empire Quarterly Economic Report | Economic Research | 1988-Present |
| KVCR-FM | Weekly Commentator | Inland Empire Economy | 2011-2019 |
| Executive Committee | CA Community College Strategic Plan | Community Colleges | 2005 |
| Columnist | The Business Press, Inland Empire | Newspaper | 1998-2006 |
| Executive Committee | Inland Empire Economic Partnership | Economic Development | 1995-2003 |
| President | Inland Empire Economic Partnership | Economic Development | 1994 |
| Economist | CSU San Bernardino | Economic Research | 1990-1992 |
| Senior Consultant | California State Assembly Majority Services | Analyst | 1980-1984 |
| Associate Professor | San Bernardino Valley College | Business & Economics | 1966-1981 |

Rail Delivery Driver Analysis                                                                                                              13

**Relevant Recent Research/Publications**

1. **CTA v. CA Attorney General, 2019-2020.** Analyzed California's AB5 rules on the routes, rates, and services of independent trucking firms in the state. This work was used in the lawsuit to challenge the elimination of independent trucking operations in the state. Client: California Trucking Association.

2. **2019 Study of Rail Delivery Services 2018 Contract Drivers**. Using internal data from RDS, the study had the purpose of providing the company with an understanding of the gross revenue, gross costs, and net earnings of its drivers as well as their net earnings per hour. Client: Rail Delivery Services.

3. **Analysis of the Net Earnings of Independent Owner Operator Truckers, 2017**. With data provided on over 2,000 independent truckers working in California, conducted an analysis of the gross revenues, operating costs, and net earnings. Client: California Trucking Association.

4. **Economic Analysis of the Clean Truck Program at the Ports of Los Angeles and Long Beach, 2007.** Analysis of the complex issues of how the Clean Truck Program would reorganize the movement of cargo from the ports into and through Southern California This work involved extensive discussions with the individuals working on the logistics issues surrounding the ports and movement of goods. These included ocean carriers, Pacific Merchants Shippers Association, trucking companies, supply chain managers of beneficial cargo owners (*e.g. retailers*), warehousing managers, railroads, National Resources Defense Fund, Southern California Air Quality Management District, California Air Resources Board, public health advocates, neighborhood associations, manufacturers of clean vehicles, business associations, regional planning groups, local and state political leaders, International Longshore Workers Union, Teamsters, Change To Win. Client: Ports of Los Angeles and Long Beach.

5. **SCAG Regional Goods Movement Study, 2008-2010**

   Developed database of each distribution facility located in Southern California (*over 10,000*). Developed GIS location of each facility. Developed a classification system for each type of warehousing and trucking facility in collaboration with knowledgeable executives from logistics associations. Extensively interviewed executives managing each type of facility. Also interviewed executives of major firms building and leasing facilities as well as corporate supply chain managers. Interviewed numerous commercial brokers attempting to lease facilities.

   Held extensive meetings with planning directors of communities where warehousing facilities have been extensively located and where they are starting to locate. Participated in several goods movement round tables made up of truckers, warehouse owners, supply chain managers, port and railroad executives, city planners and managers, state legislators, regional planners dealing with funding logistics infrastructure, environmentalists, and public health advocates. Client: Southern California Association of Governments.

6. **Economic Impact of Proposed Logistics Facilities, 2007-2011.** Analysis of the economic impact of building new logistics projects. These have been done for a variety of clients proposing facilities in Chino, Redlands, San Bernardino, Victorville, Rialto, Moreno Valley.

Clients included: Watson Land Co., Hillwood, Highland Fairview, Lewis Operating Companies, Target, McShane Development Co., Stirling International.

7. **Multi-County Goods Movement Action Plan, Southern California, 2006-2007**

   Developed model of sectors making up the goods movement "sector" and the occupations within each sector. Developed data on the pay for each occupation in each sector as well as the total payroll and employment in each sector. Developed data on educational level required for each occupation within each sector as well as the years of experience and created workforce ladders up which workers could progress. Created demand model for logistics sector and forecast of demand. This permitted creation of an economic impact model showing the effect of the logistics sector on of the sectors on Southern California's economy and the overall economic impact on the seven Southern California counties. Impact work included opening of upper mobility for blue collar workers as well as the dollar and overall job impacts given the labor force difficulties in principal alternative sectors: construction and manufacturing. Client: Seven Southern California Transportation Agencies, Southern California Association of Governments, CALTRANS.

8. **Economic Development Strategy, Southern California, 2010-11.** Held lengthy one on one discussions with 130 entrepreneurs and executives in the sectors bringing money into the Inland Empire's economy. Identified strategy lines for expanding those sectors as part of a Southern California economic development strategy. Clients: Southern California Association of Governments, San Bernardino County.

9. **Transportation Uniform Mitigation Fees (*TUMF*). 2004, 2007**

   Researched the impact of Western Riverside County's TUMF fees on non-residential projects in that area compared to Orange County and San Bernardino County. Client: Western Riverside Council of Governments.

10. **Logistics & Distribution: An Answer to Regional Upward Social Mobility, 2004**

    Analysis of Southern California's declining per capita income status, the need for a sector to replace manufacturing as a source of upward mobility for marginally educated workers, and the case for why the logistics industry can play this role if its infrastructure issues are met. Client: Southern California Association of Governments.

11. **Economic Impact of Santa Fe Intermodal Rail Yards, 1995, 2001, 2007.** Researched the job and economic impact of developing a 500,000 lift capacity intermodal rail yard in the City of San Bernardino. Work explained the location advantage of intermodal rail for warehousing & manufacturing firms in areas of San Bernardino County. Importance of potential intermodal rail yard in Victorville. Client: BNSF Railway.

12. **Economic Impact of Roadway Express cross-docking facilities on the efficiency of goods movement in the I-10 Corridor of San Bernardino County, 1999.** Study of how locating Roadway's cross docks near to Burlington Northern Santa Fe Railroad intermodal yard, Ontario International Airport, and the 200 million feet of industrial space developed since 1985 will increase the efficiency, lower the cost and increase the competitiveness of the goods moving industry in that area. Client: Roadway Express.

13. **Peer Review, SCAG Analysis on AB 32 Global Warming Solutions Act.** Helped draft peer review of SCAG research on policies designed to implement AB 32. The report was highly critical of the analysis. Client: Southern California Association of Governments.

14. **Inland Empire Quarterly Economic Report, 1965-1969; 1988-Present**

    Author of the respected *Inland Empire Quarterly Economic Report* (QER), a publication now in its 33rd year that is distributed to 12,000 business and governmental leaders. The QER gives hard data on the Inland Empire economy, discusses the impacts of economic trends and governmental policies.

15. **Comprehensive Economic Development Data & Strategies:** Data presentations tracking local variables like population, retail sales, home prices & sales, assessed valuation, new firm locations, employment, law enforcement, education. Explanations of the forces at work. Created detailed economic development strategies based upon these data and the current economic conditions and the forces affecting each community. Most recent: Redlands, Garden Grove, Ontario, Rancho Cucamonga, Chino, 2003-2011.


**Expert Testimony Within the Last 10 Years**

1. **CITY OF ONTARIO VS CITY OF LOS ANGELES,** Riverside County Superior Court Case No. RIC1306498 (Expert Deposition 2015).

2. **WYROC V. PACIFIC CLAY PRODUCTS,** (Expert Deposition 2011).

# Appendix A

**Federal Motor Carrier Safety Regulations Hours of Service of Drivers, On-Duty Definitions**

**49 CFR 395.2**

On-duty time means all time from the time a driver begins to work or is required to be in readiness to work until the time the driver is relieved from work and all responsibility for performing work. On-duty time shall include:

(1) All time at a plant, terminal, facility, or other property of a motor carrier or shipper, or on any public property, waiting to be dispatched, unless the driver has been relieved from duty by the motor carrier;

(2) All time inspecting, servicing, or conditioning any commercial motor vehicle at any time;

(3) All driving time as defined in the term driving time;

(4) All time in or on a commercial motor vehicle, other than:

> (i) Time spent resting in or on a parked vehicle, except as otherwise provided in § 397.5 of this subchapter;
>
> (ii) Time spent resting in a sleeper berth; or
>
> (iii) Up to 3 hours riding in the passenger seat of a property-carrying vehicle moving on the highway immediately before or after a period of at least 7 consecutive hours in the sleeper berth;

(5) All time loading or unloading a commercial motor vehicle, supervising, or assisting in the loading or unloading, attending a commercial motor vehicle being loaded or unloaded, remaining in readiness to operate the commercial motor vehicle, or in giving or receiving receipts for shipments loaded or unloaded;

(6) All time repairing, obtaining assistance, or remaining in attendance upon a disabled commercial motor vehicle;

(7) All time spent providing a breath sample or urine specimen, including travel time to and from the collection site, to comply with the random, reasonable suspicion, post-crash, or follow-up testing required by part 382 of this subchapter when directed by a motor carrier;

(8) Performing any other work in the capacity, employ, or service of, a motor carrier; and

(9) Performing any compensated work for a person who is not a motor carrier.